# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| **MATTHEW PETRIE,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 3:11-CV-0715-M** |
| **CITY OF GRAPEVINE and EDWARD SALAME in his individual capacity,** | **JURY DEMANDED** |
| | **District Judge Barbara M.G. Lynn** |
| **Defendants.** | **Magistrate Judge Jeff Kaplan** |

_____

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' 12((b)(6) MOTION TO DISMISS AND ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

_____

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

TABLE OF CONTENTS………….........……………………………………………………………ii

TABLE OF CASES……………………………………………………………………..iii-iv

I. SUMMARY OF ARGUMENT………………………………………………………2

II. ARGUMENT AND AUTHORITIES……..…………………………… ………………2

      A.    Defendants Caused an Adverse Employment Action …………………..…………...…………...2

      B.    Petrie Spoke on a Matter of Public Concern...…………..…………….6

            1.    The Content Shows a Matter of Public  Concern...…………..…………….....……..7

            2.    The Context Shows a Matter of Public  Concern...…………..…………….....…..8

            3.    The Form Shows a Matter of Public  Concern...…………..…………….....…10

      C.    Petrie's Speech Was Not Unduly Disruptive..…………..……………11

      D.    Petrie's Spoke as a Citizen……………….…………...……………12

      E.    Custom or Policy………..…………….…………….…………16

      F.    Salame is Not Entitled to Qualified Immunity...…………..……………16

III.  RELIEF REQUESTED…………………………......…………………………………16

## TABLE OF CASES

*Banks v. East Baton Rouge Parish Sch. Bd.*, 320 F.3d 570 (5th Cir. 2003)

*Branton v. City of Dallas*, 272 F.3d 730 (5th Cir. 2001)

*Bowman v. Pulaski County Special Sch. Dist.*, 723 F.2d 640 (8th Cir. 1983)

*Charles v. Grief*, 522 F.3d 508 (5th Cir. 2008)

*Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273 (5th Cir. 2003)

*Click v. Copeland*, 970 F.2d 106 (5th Cir. 1992)

*Connick v, Myers*, 461 U.S. 138 (1983)

*Dabertin v. HCR Manor Care, Inc.*, 68 F. Supp.2d 998 (N.D. Ill. 1999)

*Davis v. McKinney*, 518 F.3d 304 (5th Cir. 2008)

*Forsyth v. City of Dallas*, 91 F.3d 769 (5th Cir. 1996)

*Fyfe v. Curley*, 902 F.2d 401 (5th Cir. 1990)

*Garcetti v. Ceballos*, 547 U.S. 410 (2006)

*Globalaw Ltd. v. Carmon & Carmon Law Office*, 452 F.Supp.2d 1 (D.D.C. 2006)

*James v. Collin County*, 535 F.3d 365 (5th Cir. 2008)

*Leary v. Daeschner*, 349 F.3d 888 (6th Cir. 2003)

*Lytle v. Wondrash*, 182 F.3d 1083 (9th Cir. 1999)

*Looney v. Town of Marlborough*, No. 3:10-cv-1068 (D. Conn. July 30, 2011)

*Matthews v. Highland Indep. Sch. Dist.*, 991 F. Supp. 840 (S.D. Tex. 1998)

*McKay v. Dallas Indep. Sch. Dist.*,
Civil Action No. 3:06-CV-2325-O (N.D. Tex. March 3, 2009)

*Modica v. Taylor*, 465 F.3d 174 (5th Cir. 2006)

*Peacock v. Duval*, 694 F.2d 644 (9th Cir. 1982)

*Reeves v. Claiborne County Bd. of Educ.*, 828 F.2d 1096 (5th Cir. 1987)

*Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990)

*Salge v. Edna Indep. Sch. Dist.,* 411 F.3d 178 (5th Cir. 2005)

*Sharp v. City of Houston*, 960 F. Supp. 1164 (S.D. Tex. 1997)

*Sharp v. City of Houston*, 164 F.3d 923 (5th Cir. 1999)

*Snyder v. Phelps*, 131 S. Ct. 1207 (2011)

*Swilley v. Alexander*, 629 F.2d 1018 (5th Cir. 1980)

*Tompkins v. Vickers*, 26 F.3d 603 (5th Cir. 1994)

*Valle v. City of Houston*, 613 F.3d 536 (5th Cir. 2010)

*Waters v. Churchill*, 511 U.S. 661 (1994)

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **MATTHEW PETRIE,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 3:11-CV-0715-M** |
| **CITY OF GRAPEVINE and EDWARD SALAME in his individual capacity,** | **JURY DEMANDED** |
| | **District Judge Barbara M.G. Lynn** |
| **Defendants.** | **Magistrate Judge Jeff Kaplan** |

_____

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' 12((b)(6) MOTION TO DISMISS AND ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

_____

Plaintiff Matthew Petrie, through undersigned counsel, files and serves this Brief in Support of Plaintiff's Response to Defendants' 12(b)(6) Motion to Dismiss and Alternative Motion for Summary Judgment, and respectfully states:[1]

_____

[1]    Plaintiff refers to "Defendants' 12(b)(6) Motion to Dismiss, or in the Alternative, Traditional/No Evidence Motion for Summary Judgment" as the "Motion."

Unless otherwise noted, Plaintiff has supplied all emphases, omitted all internal quotation marks and internal citations from case quotations, and omitted all citing and quoting references from case citations.

This Brief supports the Response and is supported by the declarations, evidence, and documents included in the separately filed Appendix in Support of Plaintiff's Response to Defendants' 12(b)(6) Motion to Dismiss and Alternative Motion for Summary Judgment (the "Appendix").

## I.     SUMMARY OF ARGUMENT

Defendants caused an adverse employment action to a long-time public servant and police officer in violation of the First Amendment.   Petrie spoke out on a matter of public concern.   The content, context, and form of his speech show as much.   His speech was not unduly disruptive and he spoke as a citizen rather than pursuant to his job duties.

## II.     ARGUMENT AND AUTHORITIES

### A.     <u>Defendants Caused an Adverse Employment Action</u>

First Amendment retaliation jurisprudence prohibits "adverse employment action."[2]  This is not a difficult hurdle for plaintiffs.  The United States Supreme Court has emphasized the importance of guarding constitutional rights in this area:

> [T]he First Amendment . . . protects state employees . . . from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights.'[3]

Although the Fifth Circuit has not applied this language literally, courts have wisely interpreted this statement in its proper context — "a series of retaliatory acts, while not separately actionable, might in total be sufficiently chilling of First Amendment rights to be cognizable."[4]

---

[2]     *Modica v. Taylor*, 465 F.3d 174, 180 (5th Cir. 2006) ("To prevail on a § 1983 First Amendment retaliation claim, a public employee must establish the following:  (1) she suffered an adverse employment action . . . .").

[3]     *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990) (dicta).

[4]     *Sharp v. City of Houston*, 960 F. Supp. 1164, 1180 (S.D. Tex. 1997).

So for decades the Fifth Circuit has applied broad breadth in evaluating adverse action under Section 1983 — broader than under Title VII.[5]   The Fifth Circuit has concluded that a transfer without decrease in pay, grade, or title may constitute adverse employment action if the new position "proves objectively worse — **such as** being less prestigious or less interesting or providing less room for advancement."[6]

In evaluating such factors, formal job descriptions matter little if at all:   The *actual* duties performed in each position are what matter.[7]   That a generic written job description for a "Senior Officer/Corporal" position in the "Patrol-CID" Division may reference patrol[8] is unimportant.   Defendants' contention that "physical fit-for-duty requirements of GPD are the same for Patrol Officer and SRO"[9] is also unimportant —

---

[5]       *See, e.g., Banks v. East Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 580 (5th Cir. 2003) (noting that adverse employment action for purposes of Section 1983 may even include "reprimands and disciplinary filings" that may not be actionable under Title VII); *Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir. 1996) (concluding that transfer of police with no change in pay — from intelligence unit to uniformed patrol — was an adverse employment action because prior positions involved more prestige, were more interesting, and involved better hours); *Fyfe v. Curley*, 902 F.2d 401, 404-05 (5th Cir. 1990) (concluding that transfer to "less responsible, more menial job at the same wage" amounted to constitutional deprivation).

[6]       *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999) (concluding that transfer from mounted horse police patrol to police academy involved sufficiently less prestigious position to constitute adverse employment action).   After all, "[m]oney alone . . . does not buy happiness." *Click v. Copeland*, 970 F.2d 106, 110 (5th Cir. 1992) (denying claim of qualified immunity because law was clearly established that transfer without decrease in pay could constitute adverse employment action).

[7]       *See Garcetti v. Ceballos*, 547 U.S. 410, 424-25 (2006) ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform").   Although the United States Supreme Court noted as much in the context of establishing a framework for courts to analyze whether speech was made pursuant to employment duties, there is no reason that axiom should not be applied in the context of analyzing adverse action.

[8]       *See* Defendants' Brief at p. 15; *see also* Defendants' Appendix at p. 6.

[9]       Defendants' Brief at p. 16.

particularly given that fit-for-duty examinations were sparse.[10]

What is important is *evidence* that the patrol position (1) is bottom rung, entry-level;[11] (2) involves shift work of odd hours and days that is hard on family life;[12] (3) can be dangerous;[13] and (4) is physically demanding due to situations encountered[14] and the

---

[10]     *See, e.g.,* Wall Declaration, App. 61, ¶ 13 ("During my tenure with the Police Department, police officers were not regularly required to take physical fitness-for-duty examinations after the hiring process was concluded. For example, none of the police officers in the Police Department had to take a physical fitness-for-duty examination on any weekly, monthly, annual, semi-annual, or other regular basis. In my experience, the only time a fitness-for-duty examination was required after the hiring process concluded involved a return to work after a period of time out for injury or illness.").

[11]     *See* Wall Declaration, App. 59, ¶ 4 ("The position of patrol officer was normally the entry-level position for a police officer, even for police officers transferring to the Police Department from another police department. It was unusual for a police officer to start work with the Police Department in a position other than patrol officer.").

[12]     *See* Wall Declaration, App. 59, ¶ 5 ("Patrol officer duties involved shift work of odd hours and odd days of work. None of the patrol officer shifts involved a traditional Monday through Friday work week from 8 a.m. to 5 p.m. or 9:00 a.m. to 6:00 p.m. Even for the most preferred shifts, holiday work normally was required when a holiday fell during the assigned shift days. This type of shift work could be hard on family life due to time away from family. There was a saying in the Police Department that "patrol is a young man's game." Part of the reason for this saying was the often adverse impact of shift work on family life.   ").

[13]     *See* Wall Declaration, App. 59, ¶ 6 ("Patrol officer duties generally included answering calls for service, enforcing penal laws, enforcing traffic laws, and patrolling to deter, spot, and stop criminal activity. Patrol officer duties were dangerous due to the nature of the situations that patrol officers encountered. For example, roadside traffic stops involved danger from oncoming vehicles including drivers under the influence of drugs or alcohol. The Police Department announced at one point during my tenure that a traffic officer died as a result of injuries when, during a traffic stop, a vehicle operated by a drunk driver hit the officer. Patrol officers, including me, faced a variety of situations that involved the risk of injury or death — roadside traffic stops, volatile domestic violence situations, criminals who did not want to be apprehended, suspects who decided to fight, situations involving drug use or drug offenses, and criminals who would not hesitate to kill a police officer. While a patrol officer did not regularly face each one of these situations, a patrol officer did regularly face some situation that involved risk of injury or death.")

[14]     *See* Wall Declaration, App. 59, ¶   7 ("Patrol officer duties were also physically demanding due to the nature of the situations that patrol officers encountered. Patrol officers, including me, sometimes had to chase the person who did not want to be apprehended, sometimes had to appropriately restrain someone larger, heavier, stronger, or younger than the responding officer, and sometimes had to physically assist someone who was seriously injured or otherwise needed physical assistance. Although these situations did not happen all the time, a patrol officer was far more likely to face these situations than officers in other positions at the Police

type of driving involved.[15]

What matters is *evidence* that the school resource position was not entry-level, had better hours, involved less danger, and was less physically-taxing — in general and on Petrie in particular.[16]   What matters is that the obvious difference between being responsible for confronting and apprehending potentially dangerous criminal suspects and working in an academic environment with children and parents.  What matters is the difference in performing patrol duties only when school was out versus performing them day-to-day, month-to-month, year-to-year.

What should also be important is evidence showing the transfer was *intended* as punishment.  Defendants themselves describe the speech as a "violation"[17] an "offense"[18]

_____

Department.  Again, there was a saying in the Police Department that 'patrol is a young man's game.'  Part of the reason for this saying involved the physical demands of the job.").

[15]     *See* Wall Declaration, App. 59-60, ¶ 8 ("Patrol officer duties were also physically demanding due to the nature of the driving involved.  Driving for long periods of time in a squad car is tough, and patrol officers, including me, regularly spent lengthy periods of time driving a squad car.  Like driving for long periods of time on a trip, the driving was draining and became physically uncomfortable.  Unlike driving for long periods on a trip, driving a squad car as a patrol officer involved intense concentration for criminal activity and more stop and go activity.  Patrol officers also were not normally driving a new vehicle — the vehicles were driven to high mileage and the seat cushioning wore down over time.  Again, during my tenure with the Police Department, there was a saying 'patrol is a young man's game.'  Part of the reason for this saying involves the physical toll that driving for long periods in a squad car causes.").

[16]     *See* Petrie Declaration, App. 8-9, ¶ 27; Wall Declaration, App. 60, ¶ 9 ("During my tenure with the Police Department, I became aware at some point that Matthew Petrie ('Petrie') had spinal problems.  When Petrie was a School Resource Officer ('SRO'), he would sometimes assist with patrol duties for the summer break while school was out and while I was also working patrol duties.  During this time, I personally observed in Petrie outward expressions of back pain, such as facial expressions of pain, the manner in which he walked at the end of the shift, and the trouble he had getting out of the car.  While Petrie was able to simply work with pain and sustain the patrol activities for brief periods such as summer break, based on my experience and observation, he would not have been able to sustain patrol duties on a full-time basis day after day and year after year.").

[17]     Defendants' Brief at p. 14 ("Both Chadwell and Ingram independently communicated with Chief Salame with news of Plaintiff's violations [for speaking outside a chain of command]").

and an act of "insubordination."[19]  Not the kind of behavior rewarded via transfer to a

*better* position.  The history of using transfers to force retirements[20] and punishing people

for speaking outside a chain of command[21] — coupled with knowledge of the physical

demands of patrol and Petrie's back problems — shows this transfer was intended as

punishment.  As a matter of common sense, transfer to another position would only be

punitive if the position was worse.  In sum, there is sufficient evidence of adverse action.

### B.    Petrie Spoke on a Matter of Public Concern

The Fifth Circuit has broadly defined "matters of public concern" as "those which

can be fairly considered as relating to **any** matter of political, social, or other concern to

---

[18]     Defendants' Brief at p. 14 ("This was not Plaintiff's first offense.").

[19]     Defendants' Brief at p. 14 ("Plaintiff's insubordination only served to . . . .").

[20]     *See* Wall Declaration, App. 60-61, ¶ 11 ("At times during my tenure with the Police Department and while Chief Salame was the Chief of Police ('Chief Salame'), I personally observed transfers to patrol duties that — based on my training and experience — appeared to be an effort to force a police officer to quit or retire or an effort in which the most likely result was a police officer would quit or retire.  The Police Department announced that Police Department Chaplain Terry Wilson ('Wilson') was being transferred back to patrol duties.  I knew Wilson, and Wilson was over 50 years old and obviously not in good physical condition.  Based on my training and experience, I did not think Wilson would survive long in the patrol position.  Before the transfer took effect, the Police Department announced that Wilson had retired.  The Police Department announced that James Donaldson was being transferred back to patrol.  I knew Donaldson, and Donaldson was over 50 years old and had been working with computers and out of patrol for years.  Based on my training and experience, I thought that, given his age and length of time out of patrol, Donaldson would not last in the patrol position.  Before the transfer took effect, the Police Department announced that Donaldson had retired.").

[21]     *See* Wall Declaration, App. 61, ¶ 14 ("While Chief Salame was the Police Department Chief, I observed that police officers who spoke outside the chain of command on any issue that might remotely affect the Police Department were punished.  To a large extent, the more controversial the issue, the more restrictive the practice was with respect to efforts to stop speech outside the chain of command.  It was common knowledge that an unwritten rule prohibited speech outside the chain of command on any issue that might even be tangentially related to the Police Department.  The unwritten rule pre-date Chief Salame as the Police Department Chief and continued throughout my tenure with the Police Department.").

the community."[22]   Whether an employee's speech may be "fairly characterized as constituting speech on a matter of public concern" is a question of law.[23]   In making this determination, courts consider the "content, form, and context of a given statement, as revealed by the whole record."[24]

### 1.    The Content Shows A Matter of Public Concern

On content, the subject of care and education of children in public schools ranks high among matters of public concern.[25]   Accordingly, the Fifth Circuit has repeatedly determined that speech on the topic of children in public schools is on a matter of public concern [26]   Likewise, the Fifth Circuit has repeatedly determined that speech on the subject of public school programs and change in school curricula are matters of public

---

[22]    *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001); *see also Connick v, Myers*, 461 U.S. 138, 146 (1983) (noting that it is only "[w]hen employee expression <u>cannot</u> be fairly considered as relating to <u>any</u> matter of political, social, or other concern to the community" that "government officials should enjoy wide latitude in managing their offices . . . .").

[23]    *Connick*, 461 U.S. at 148 n.7; *accord Branton*,  272 F.3d at 739.

[24]    *Connick*, 461 U.S. at 147-148 (1983) ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."); *accord Branton*, 272 F.3d at 739-740.

[25]    *Bowman v. Pulaski County Special Sch. Dist.*, 723 F.2d 640, 644 (8th Cir. 1983) (finding speech protected and stating:  "The question of what constitutes the proper care and education of children is one of the most frequently debated issues in the public forum. In this century some of the great public debates can be found to focus on the classroom.").

[26]    *See, e.g., Reeves v. Claiborne County Bd. of Educ.*, 828 F.2d 1096, (5th Cir. 1987) ("We agree with the district court that Reeves' testimony concerning the operation of the public schools constitutes a matter of 'public concern.'"); *Swilley v. Alexander*, 629 F.2d 1018, 1021 (5th Cir. 1980) ("Surely, the physical safety and well-being of our school children is as important an issue for public scrutiny as is the allocation of school funds between athletic and educational programs" [found protected in *Pickering*]); *see also Matthews v. Highland Indep. Sch. Dist.*, 991 F. Supp. 840, 846 (S.D. Tex. 1998) ("The Court finds it axiomatic that reporting misconduct of a principal, especially misconduct regarding not only sexual harassment, but sexual misconduct in the presence of children, in a grievance to the school board constitutes a 'matter of public concern' worthy of First Amendment protection.").

concern.[27]  So have other circuits.[28]  Here, the content of the speech at issue fits squarely

within this precedent.  Petrie spoke about retaining DARE — a school-based drug use

prevention program — in a local public school district [GCISD]'s curriculum.[29]

### 2.    The Context Shows a Matter of Public Concern

Courts have been particularly likely to determine speech is on a matter of public

concern if the topic would be a "subject of legitimate news interest."[30]  Here, the topic of

GCISD dropping out of the DARE program was the subject of an article published by a

local newspaper [the Fort Worth Star Telegram].[31]   The article is titled "DARE's

Popularity Falters in Area."[32]  It discusses which school districts in North Texas  dropped

---

[27]     *See Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003) ("The subject matter of [Plaintiffs]' materials concerned a debate over a change in public school curriculum [a math curriculum], an issue of public concern for parents of children enrolled in the [Plano Independent School District]."); *Tompkins v. Vickers*, 26 F.3d 603, 606-07 (5th Cir. 1994) ("We are persuaded that [teacher / employee]'s complaints about cancelling the art program at a  black junior high school for no apparent reason while maintaining the art program at a white junior high school relates to a matter of public concern.").   Although the *Chiu* opinion involved suppression of parents' speech rather than employees, the "matter of public concern" issue is the same.

[28]     *See, e.g., Leary v. Daeschner*, 349 F.3d 888 (6th Cir. 2003) (speech criticizing student discipline matters and implementation of appropriate educational programs); *Lytle v. Wondrash*, 182 F.3d 1083 (9th Cir. 1999) (speech regarding school education program); *Peacock v. Duval*, 694 F.2d 644 (9th Cir. 1982) (questioning policy related to the administration of a public medical school).

[29]     Petrie Declaration App. 5, ¶ 15.

[30]     *See Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011); *Salge v. Edna Indep. Sch. Dist.,* 411 F.3d 178, 189 (5th Cir. 2005) ("'[t]he very fact of newspaper coverage [of the matter discussed by the employee]' indicates that `the public was receptive and eager to hear about [the matter]'").  Although the *Phelps* opinion did not involve an employment situation, it relied upon *Connick* and other "employee speech" opinions in assessing whether the speech at issue addressed a matter of public concern.

[31]     Newspaper Article, App. 82-84.

[32]     *See id.*

out of DARE in recent years.[33]  It was published in the Summer of 2009 within months of Petrie's speech on the topic.[34]

The debate about whether to retain the DARE program — the most widely used school-based drug prevention program in the United States — is national in scope.[35] Academics in such fields as economics, education, and sociology have published critiques of the DARE program.[36]  The non-profit organization ProCon.com — a charity that promotes critical thinking on controversial issues — lists the DARE debate among its 42 topics.[37]  In recently months, there has been news coverage in places such as Laramie, Wyoming focusing on the same issues:  public school districts considering whether to retain the DARE program.[38]

So, the context in which Petrie made his speech was in the midst of a local and national debate — being published in journals and newspapers throughout the country — about the efficacy of DARE in public schools and whether public school districts should keep it.  This context shows Petrie's speech was on a matter of public concern.

---

[33]     *See id.*

[34]     *See id.*

[35]     *See id..* 85-131.

[36]     *See id.* at 96-127.

[37]     *See id.* at 128-131.

[38]     *See id.* at 91-95.

3.      **The Form Shows a Matter of Public Concern**

As to form, the First Amendment protects speech of a government employee that is made privately.[39]   Nevertheless, as might any parent or citizen who wants his son's school district to retain a curriculum, Petrie met with a *public* official who might be able to influence whether GCISD retained the DARE program — the Colleyville Chief of Police.[40]   Moreover, while the First Amendment even protects speech made *at work* and *while working*,[41] Petrie took efforts — such as meeting off-duty, out of uniform, etc. — to make clear he was speaking as a parent of a child in the public school system and a representative of the Texas DARE Officers Association.[42]   This form shows Petrie's

---

[39]     *Connick*, 461 U.S. at 146 (reiterating that "First Amendment protection applies when a public employee arranges to communicate privately with his employer rather than to express his views publicly"); *Ghivan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415-416 (1979) ("The First Amendment forbids abridgment of the 'freedom of speech.' Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. We decline to adopt such a view of the First Amendment.").

[40]     Petrie Declaration, App. at 5, ¶ 15 ("Against this backdrop — in or around May of 2009 — I met with the City of Colleyville Chief of Police Tommy Ingram ("Chief Ingram") and discussed my concerns about the potential end of the DARE program at GCISD.  The meeting took place at Chief Ingram's office in Colleyville.  I discussed retaining the DARE program, working to improve the DARE program rather than dropping the DARE program from the GCISD curriculum, and funding for the DARE program at GCISD.").

[41]     *See Salge,* 411 F.3d at 191 ("We note, nonetheless, that if EISD's argument were accepted it would undermine First Amendment protection for employees who speak *at* work *while* working:").

[42]     Petrie Declaration, App. 5, ¶ 15 ("I met with Chief Ingram after work.  I was off duty.  I was not in uniform.  I was wearing a Texas DARE Officers Association t-shirt and specifically informed Chief Ingram that I was not there as a representative of the Police Department and that I was instead there as a representative of the Texas DARE Officers Association.  I may have informed Chief Ingram that I was also concerned as a parent about the possible loss of the DARE program, but I did not tell Chief Ingram that my principal ambition was to be my son's DARE instructor or anything along those lines.  I did not discuss my job duties as a School Resource Officer during this meeting.  Chief Ingram ultimately responded that if the school district wanted to continue the DARE program, then he would find a way to fund it, but he was leaving the issue to the school district.").

speech was on a matter of public concern.

## C.      Petrie's Speech Was Not Unduly Disruptive

The Fifth Circuit recognizes that "[t]he basic thrust of the Supreme Court's *Pickering* line of cases has been 'to ensure that public employers do not use authority over employees to silence discourse ... simply because superiors *disagree with the content* of employees' speech.'"[43]  Further, a public employee's speech on the subject of an outside agency [an agency that is not the employer] is, obviously, less disruptive to the employer.[44]

Here, the content, form, and context of the speech [above] — a one-time, brief conversation with a public official of a different agency about GCISD's curriculum — shows nothing inherently disruptive.  No criticism of persons.   No loud protests through the hallways.   No yelling, marching, or picketing.   It was about as civil as you might expect between two law enforcement officers.

If the speech was disruptive to the City, Defendants do not explain how. Defendants only write generally about "close working relationships" being "essential," needing "complimentary efforts to be efficient," and GCISD requiring "consistent and uniform application of its curriculum."[45]  But Petrie's speech met these goals — the

---

[43]      *James v. Collin County*, 535 F.3d 365, 380 (5th Cir. 2008) (emphasis in original).

[44]      *See Looney v. Town of Marlborough*, No. 3:10-cv-1068 (D. Conn. July 30, 2011) ("[Plaintiff], by contrast, did not express his opposition to Town policies or actions. Instead, [Plaintiff] alleges that he expressed his view that an outside state agency lacked the authority to issue cease-and-desist orders to Town residents for their use of wood-burning stoves. Based upon [Plaintiff]'s allegations, there is no indication that [Plaintiff]'s speech criticizing a state agency had any potential to disrupt the activities of the Town or undermine the Town's policies or initiatives.").

[45]      *See* Defendants' Brief at p. 13-14

speech was an expression of support for a *then-existing* school curriculum.  Moreover, there is no *evidence* submitted — or even specific allegations — of any actual or potential disruption.

### D.     Petrie Spoke as a Citizen

Defendants claim that Petrie's speech was not constitutionally protected because he spoke on a matter that is "job related."[46]  Defendants rely upon *Garcetti v. Ceballos* and its progeny.  Defendants overstate the reach of *Garcetti*.

In a 5-4 decision, the *Garcetti* Court held that "when public employees make statements **pursuant to** their official [job] duties, the employees are not speaking as citizens for First Amendment purposes."[47]  Significantly, the speech in *Garcetti* involved the written "work product" of a supervising prosecutor[48] — a regularly-submitted "disposition memorandum" concerning a pending criminal case.[49]  The Court concluded that the speech was not protected under the First Amendment because the prosecutor admittedly prepared the "disposition memorandum" pursuant to his regular duties as a prosecutor, and not as a citizen.[50]

The Court emphasized several times the limited nature of the holding.  Indeed, the Court noted that (1) the plaintiff did "not dispute that he prepared the memorandum pursuant to his duties as a prosecutor;" (2) the plaintiff wrote the memorandum "because

---

[46]      *See* Defendant's Brief, p. 8 ¶ 19, p. 9 ¶ 22.

[47]      *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

[48]      *See id.* at 413, 422.

[49]      *Id.* at 414; *see also id.* (noting that the supervising prosecutor's review of pending cases "was not unusual" under the circumstances presented in the case).

[50]      *Id.* at 421.

that is part of what he . . . was employed to do;" (3) the plaintiff was conducting work in the nature of "his daily professional activities;" (4) the plaintiff was merely "performing the tasks he was paid to perform;" and (5) the disposition memorandum was "work product."[51]

Even then, the Court further limited its holding in several ways.  First, **speech made at work may still be protected**.  The Court expressly warned — "That [plaintiff] expressed his views inside his office, rather than publicly, is not dispositive."[52]  Indeed, the Court reiterated that speech within the workplace may still be protected and **rejected** any *per se* rule that "all speech within the office is automatically exposed to restriction."[53]

Second, the Court made clear that **speech concerning the subject matter of employment may still be protected**.  Again, the Court expressly warned — "The memo concerned the subject matter of [plaintiff's] employment, but this, too, is nondispositive."[54]  The Court reaffirmed that speech "related to the speaker's job" may be protected under the First Amendment.[55]

Third, the Court warned that **broad job descriptions will not defeat a First Amendment claim**.  The Court explained:

> [T[he parties in this case do not dispute that [plaintiff] wrote his disposition memo pursuant to his employment duties.  We thus have no

---

[51]   *Id.* at 420-421.

[52]   *Id*. at 420.

[53]   *See id.* at 420-421.

[54]   *Id*. at 421.

[55]   *Id.*

occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate. **We reject, however, the suggestion that employers can restrict employee's rights by creating excessively broad job descriptions**. The proper inquiry is a practical one.[56]

Additionally, the Fifth Circuit has made clear that speech may still be protected even if the employee only learns of the subject matter of the speech due to his or her work for the employer.[57]   One court explained current Fifth Circuit interpretations of *Garcetti* this way:

> However, the restricted speech must arise directly from the daily, official duties of the speaker, to be barred from First Amendment protection under *Garcetti*.  []  To hold that any employee's speech is not protected merely because it concerns facts that he happened to learn while at work would severely undercut First Amendment rights. [].[58]

The interpretation Defendants advocate — that "job related" speech is not worthy of constitutional protection — directly contravenes the United States Supreme Court's edict that "government employees are often in the best position to know what ails the agencies for which they work; public discourse may gain much from their informed opinions."[59]

The only relevant inquiry under *Garcetti* and its progeny is whether the speech is made "pursuant to" job duties — not whether it is "job related."   Here, Petrie's speech was not made in connection with fulfilling any responsibility *to his employer*.   The record establishes that Petrie did not have a duty — as any part of his daily job as an SRO — to

---

[56]      *Id*. at 424.

[57]      *Charles v. Grief*, 522 F.3d 508, 513 (5th Cir. 2008) ("To hold that any employee's speech is not protected merely because it concerns facts that he happened to learn while at work would severely undercut First Amendment rights.").

[58]      *McKay v. Dallas Indep. Sch. Dist.*, Civil Action No. 3:06-CV-2325-O (N.D. Tex. March 3, 2009) (O'Connor, J.) (memorandum opinion).  Pagination was not available for the publicly available copy of this opinion.  However, the cited material appears in Part C of the opinion.

[59]      *Waters v. Churchill*, 511 U.S. 661, 674 (1994).

speak to officials of another city on the subject of whether GCISD should retain the DARE program.[60]   Moreover, the record reveals that Chief Salame's primary concern was precisely *that it was not Petrie's job* — that Petrie spoke outside the "chain of command."[61]   When it came to sensitive matters, the Police Department had designated a specific person to speak publicly [the Public Information Officer].   However, not even the Public Information Officer had a duty to speak to anyone, much less officials of another city, on the subject of whether GCISD should retain the DARE program.

Yet, Defendants seek to have the capacity issue decided via judicial admission — claiming throughout their Brief that Plaintiff "concedes" or "admits" some speech was made in a certain capacity.[62]   But the capacity question is one of law, not capable of concession via the subjective belief of a litigant.[63]   That is, a litigant can testify to the underlying facts.   But asking litigants at deposition whether they spoke "as a _____"

---

[60]   *See* Petrie Declaration, App. 5, ¶ 13 ("None of my duties as a School Resource Officer required me to speak about the potential that GCISD would change its curriculum to end the DARE program.   None of my duties as a School Resource Officer required me to attend GCISD board meetings.   None of my duties as a School Resource Officer required me to speak to any potential change in GCISD curriculum.").

[61]   *See* Salame Declaration, Defendants' Appendix p. 48-49, ¶ 7 ("I further informed Mr. Petrie that, as a Grapevine Officer, he had gone outside the chain of command by objecting to the proposed curriculum change to Chief Ingram, and that voicing his objections to other third-parties would simply be outside the proper chain of command, . . . .").

[62]   *See, e.g.,* Defendants' Motion at p. 4, ¶ 8, Defendants' Brief at p. 4 ¶ 8.

[63]   *See Davis v. McKinney*, 518 F.3d 304, 315 (5th Cir. 2008) ("[t]he question of whether a communication is made as an employee or as a citizen is a question of law, . . . ."); *see also, e.g., Globalaw Ltd. v. Carmon & Carmon Law Office*, 452 F.Supp.2d 1, 26 (D.D.C. 2006) (concerning putative admission that term was protectable under trademark law:   "Legal conclusions simply cannot constitute admissions; that is, parties cannot bargain away legal conclusions, . . . .");*Dabertin v. HCR Manor Care, Inc.*, 68 F. Supp.2d 998, 1000 (N.D. Ill. 1999) (concerning putative admission that plan was not an ERISA plan:   "It is well established that judicial admissions on questions of law have no legal effect.").

is ultimately as fruitless an exercise as asking a litigant if they are an ERISA plan.[64] Even so, if the issue were one capable of being established by just stating the matter, Petrie has consistently maintained he spoke with Ingram "as a citizen and a parent."[65] Petrie's speech was not "pursuant to" his job within the meaning of *Garcetti*.

**D.**      **Custom or Policy**

A city's liability is established via its official action or imprimatur.[66]   The facts set forth in detail in Plaintiff's Response are more than sufficient to meet this test.

**E.**      **Salame is Not Entitled to Qualified Immunity**

The laws discussed herein are clearly established and Defendants fail to name one that is not.  Moreover, Salame's act in effectively banning all speech of which he did not approve as being outside a "chain of command" was clearly unlawful.

**III.     RELIEF REQUESTED**

For the foregoing reasons, Petrie requests that this Court deny the Motion.

---

[64]      *See id.*

[65]      *See* Petrie Deposition, Defendants' Appendix at p. 200, [147:22-23] ("Chief Ingram I spoke to as a citizen and a parent").

[66]      *See Valle v. City of Houston*, 613 F.3d 536 (5th Cir. 2010).

Respectfully submitted,


s/ David L. Wiley
_____
Amy E. Gibson
Texas State Bar No. 00793801

David L. Wiley
Texas State Bar No. 24029901

**Gibson Wiley PLLC**
1700 Commerce Street, Suite 1570
Dallas, Texas 75201-5302
Telephone:  (214) 522-2121
Facsimile:  (214) 522-2126
E-Mail Addresses:

amy@gwfirm.com
david@gwfirm.com

ATTORNEYS FOR PLAINTIFF
MATTHEW PETRIE


## <u>CERTIFICATE OF SERVICE</u>


On April 11, 2012, I electronically submitted the foregoing document with the

Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic

case filing system of the Court.  I hereby certify that I have served all counsel of record

electronically or by another manner authorized by Federal Rule of Civil Procedure

5(b)(2).


s/ David L. Wiley
_____
David L. Wiley