IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MATTHEW PETRIE                    §
                                  §
         Plaintiff,               §
                                  §
v.                                §          NO. 3-11-CV-0715-M
                                  §
CITY OF GRAPEVINE, ET AL.         §
                                  §
         Defendants.              §

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are the Rule 12(b)(6) Motion To Dismiss, or in the Alternative,

Traditional/No Evidence Rule 56 Motion for Summary Judgment filed by Defendants City of

Grapevine (the "City") and Edward Salame, the City's Chief of Police, and the Motion for Partial

Summary Judgment filed by Plaintiff Matthew Petrie. For the reasons stated below, both

motions are granted in part and denied in part.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff began working as a patrol officer for the City of Grapevine Police Department

(the"GPD") in 1988. (*See* Plf. Resp. App. at 2, ¶ 4). During his sixth year on the force, Plaintiff

started teaching the Drug Abuse Resistance Education ("DARE") program at Grapevine Middle

School ("GMS"), part of the Grapevine-Colleyville Independent School District ("GCISD").

(*See id.* at 3, ¶¶ 5 & 8; Def. MSJ App. at 89). Through the DARE program, law enforcement

personnel educate children on life skills like drug, gang, and violence avoidance. (*See* Plf. Resp.

App. at 3, ¶ 8).

In 1996, the GPD installed plaintiff as the full-time School Resource Officer ("SRO") at

GMS.  (*See id.* at 3, ¶ 5; Def. MSJ App. at 47, ¶¶ 2-3).  In that capacity, Plaintiff continued to

teach the DARE program and also provided law enforcement at GMS.  (*See* Plf. Resp. App. at 3,

¶¶ 5-6; Def. MSJ App. at 96-98).  In approximately 2002, Plaintiff began serving as treasurer of

the Texas DARE Officers Association ("TDOA"), an independent non-profit organization that

provides support for DARE programs at the local, state, and national levels.  (*See* Plf. Resp. App.

at 11-13; Def. MSJ App. at 102-03).

Towards the end of the 2008-09 school year, Plaintiff learned that GCISD was

considering eliminating its DARE program in favor of a counselor-led "Life Skills" program.

(*See* Plf. Resp. App. at 5, ¶ 14; Def. MSJ App. at 115-17, 129).  Sometime in the first half of

2009, while on SRO duty, Plaintiff shared his concerns about the end of the DARE program with

his supervisor, Sergeant Kim Smith, and GMS Principal Tom Hughes.  (*See* Plf. Resp. App. at 6,

¶ 19; Def. MSJ App. at 120-21, 136, 142, 149-51, 153).   In about May or 2009, after work,

Plaintiff met with Tommy Ingram, then-Chief of Police for the City of Colleyville, in Ingram's

office.  (*See* Plf. Resp. App. at 5, ¶ 15; Def. MSJ App. at 36, ¶ 1; 166).  Plaintiff told Ingram he

was not representing the GPD, but instead was there as a representative of the TDOA.  (*See* Plf.

Resp. App. at 5, ¶ 15; Def. MSJ App. at 37, ¶ 5; 159-60).  According to Plaintiff, he then:

> discussed retaining the DARE program, working to improve the
> DARE program rather than dropping the DARE program from the
> GCISD curriculum, and funding for the DARE program at GCISD.

(Plf. Resp. App. at 5, ¶ 15).  Plaintiff may also "have informed Chief Ingram that [he] was also

concerned as a parent about the possible loss of the DARE program[.]" (*See id.*).[1]  Plaintiff did

---

[1] According to Ingram, Plaintiff also stated that "one of his principal ambitions was to be his
son's DARE instructor when his son was old enough to enroll in [GMS]."  (*See* Def. MSJ App. at
37, ¶ 5).  Plaintiff denies this.  (*See* Plf. Resp. App. at 5, ¶ 15).  The Court, as it must, resolves

not discuss with Ingram his SRO job duties nor did he talk to Ingram about possibly losing his position.  (*See* Plf. Resp. App. at 5, ¶ 5; Def. MSJ App. at 154).

In early May, Plaintiff called Salame and asked to meet with him about the decision having been made to discontinue the DARE program.  (*See* Plf. Resp. App. at 5, ¶ 16; Def. MSJ App. at 123).  At the ensuing meeting with Salame, at which GPD Assistant Chief Ben Flanagan and GPD Lieutenant Barry Bowling were also present, Plaintiff expressed his concerns about discontinuing DARE.  (*See* Plf. Resp. App. at 6, ¶ 18; Def. MSJ App. at 48, ¶ 6).  Salame asked Plaintiff whether he had met with anyone else about the DARE program.  (See Plf. Resp. App. at 6, ¶ 18).  Plaintiff admitted to meeting with Ingram, after hours, as a TDOA representative.  (*See id.*).  Salame informed Plaintiff that in doing so he had gone outside the chain of command, warned that further objections to third parties would be outside the chain of command, and ordered him to limit any expression of such concerns to his immediate supervisor.  (*See* Def. MSJ App. at 48-49, ¶ 7).

Within one or two months of his meeting with Salame, Plaintiff learned that he had been transferred to patrol duties, also known as "Uniform Operations."  (*See* Plf. Resp. App. at 6, ¶ 19; Def. MSJ App. at 29).  Salame formally announced the transfer.  On June 29, 2009, Salame issued a memo which stated the transfer would become effective July 5, 2009.  (*See* Plf. Resp. App. at 7, ¶ 22; Def. MSJ App. at 29).  Unlike the SRO position, the patrol job required Plaintiff to spend long periods of time in a squad car.  (*See* Plf. Resp. App. at 8, ¶ 27).  After allegedly experiencing back problems due to prolonged periods of sitting in the car, Plaintiff ultimately

---

this difference in favor of Plaintiff.  *See, e.g., Bejil v. Ethicon, Inc.*, 269 F.3d 477, 479 (5th Cir. 2001) (on summary judgment, evidence produced by non-movant taken as true and inferences drawn in non-movant's favor).

retired from GPD effective April 28, 2011.  (*See id.* at 7-9, ¶¶ 23 & 27; Def. MSJ App. at 226).

On April 7, 2011, Plaintiff filed suit, asserting that Defendants retaliated against him for exercising his First Amendment right of free speech, in violation of 42 U.S.C. § 1983.  (*See* Plf. Compl. at 10-13, ¶¶ 52-66).  Defendants move for summary judgment on the merits, and Salame also asserts a qualified immunity defense.[2]  Plaintiff, in turn, moves for partial summary judgment on certain affirmative defenses of Defendants.

## II.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  If a reasonable jury could return a verdict for the non-moving party, then there is a genuine dispute of material fact.  *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lynch Props., Inc. v. Potomac Ins. Co.,* 140 F.3d 622, 625 (5th Cir. 1998).  Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary

---

[2] Although Defendants refer to their motion as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and, "in the alternative," as a motion for summary judgment under Rule 56, they rely extensively on evidence outside the pleadings.  (*See, generally*, Def. MSJ Br. at 8-10, ¶¶ 20-24; 14, ¶¶ 35-37; 16, ¶ 41).  Therefore, the Court construes Defendants' motion as one for summary judgment.  *See Pryor v. Wolfe*, 196 Fed. Appx. 260, 262, 2006 WL 2460778, at *2 (5th Cir. Aug. 22, 2006) ("If matters outside the pleadings are considered, the motion to dismiss must be treated as a motion for summary judgment under Fed. R. Civ. P. 56(c), which requires notice and an opportunity to respond with evidence.") (citing FED. R. CIV. P. 12(b)).  Defendants' alternative designation of their motion as one for summary judgment was sufficient to provide notice to Plaintiff of the nature of the motion.  *See Al-Juburi v. Chertoff*, No. 3-06-CV-1270-D, 2007 WL 2285964, at *4 (N.D. Tex. Aug. 9, 2007) (citing cases).

judgment is inappropriate, by designating specific facts beyond the pleadings that prove the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. 250; *Fields v. City of S. Houston, Tex.*, 922 F.2d 1183, 1187 (5th Cir. 1991). In determining whether a genuine dispute of material fact exists, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch Props.*, 140 F.3d at 625 (citation omitted).

### III.    ANALYSIS REGARDING DEFENDANTS' MOTION

The gravamen of Plaintiff's claims is that Defendants wrongfully transferred him from an SRO position to a patrol duty position because he spoke to Chief Ingram in favor of the DARE program. (*See, generally*, Plf. Resp. App. at 5-10, ¶¶ 17-51; *see also* Def. MSJ App. at 200). In their Motion, Defendants assert that Plaintiff cannot prove his free speech retaliation claim, cannot establish the liability of either Defendant for free speech retaliation under section 1983, and cannot overcome Salame's defense of qualified immunity. (*See* Def. MSJ Br. at 7-22, ¶¶ 15-58). The Court will address each of these arguments in turn.

A.    Plaintiff's Free Speech Retaliation Claim

A government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). To prevail on a free speech retaliation claim, a public employee must establish: (1) he was not speaking pursuant to his official job duties; (2) he was speaking as a citizen on a matter of public concern; (3) his interest in speaking outweighed his employer's interest in promoting workplace efficiency; (4) he suffered an adverse employment action; and (5) the adverse action was substantially motivated by the protected speech. *See Salge v. Edna*

*Indep. Sch. Dist.*, 411 F.3d 178, 184-86 (5th Cir. 2005); *Davis v. McKinney*, 518 F.3d 304, 312

(5th Cir. 2008) (discussing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)).[3]   While the first three of

these elements present questions of law for the Court to decide, the latter two are factual disputes

typically decided by a jury.   *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692-94 (5th Cir.

2007); *Dutta v. Pistenmaa*, No. 3-01-CV-2053-M, 2002 WL 32332550 at *5 (N.D. Tex. Nov. 8,

2002) (citing cases).   Defendants attack Plaintiff's ability to prove any of the five elements.   (*See*

Def. MSJ Br. at 7-17, ¶¶ 15-43).

1.      Whether Speech Made Pursuant to Plaintiff's Official Job Duties

        Defendants first ask the Court to determine, as a matter of law, that Plaintiff was

speaking pursuant to his official job duties during his meeting with Chief Ingram.   (*See* Def. MSJ

Br. at 10, ¶ 24 (citing *Davis*, 518 F.3d at 312)).   If made "pursuant to official duties," speech is

not constitutionally protected, no matter how great its social significance.   *Williams*, 480 F.3d at

692-93; *see also Garcetti*, 547 U.S. at 421 ("[W]hen public employees make statements pursuant

to their official duties, the employees are not speaking as citizens for First Amendment purposes,

and the Constitution does not insulate their communications from employer discipline.").   The

Fifth Circuit has defined "pursuant to official duties" as "activities undertaken in the course of

performing one's job."   *Davis*, 518 F.3d at 313.   The speech need not be "required" by the job

duties to fall within these parameters; rather, it is enough that the speech be "closely related" to

---

[3] Although *Salge* lists only four factors, the Fifth Circuit noted in *Davis* that *Garcetti* added the "threshold" question of whether the plaintiff spoke pursuant to his official duties.   *See Davis*, 518 F.3d at 312.   Defendants merge this "threshold" question with the issue of whether plaintiff spoke as a citizen on a matter of public concern.   (*See* Plf. Resp. Br. at 7-12, ¶¶ 17-32).   Because these elements are distinct and require different analyses, the Court will address them separately. *See, e.g., DePree v. Saunders*, No. 2-07-CV-185KS-MTP, 2008 WL 4457796, at *5 (S.D. Miss., Sept. 30, 2008) (recognizing that *Garcetti* added an additional element to First Amendment retaliation claims).

the duties.  *Id.* at 312 (citing *Williams*, 480 F.3d at 694).  The focus of the Court's analysis is not on the speech's content, but instead is on "the role the speaker occupied when he said it."  *Id.* (citing *Williams*, 480 F.3d at 692).  The inquiry "is a practical one," *Garcetti*, 547 U.S. at 424, during which courts have considered such nondispositive factors as the employee's job description, whether he spoke on the subject matter of his employment, and whether the speech stemmed from special knowledge gained as an employee.  *Williams*, 480 F.3d at 692; *Charles v. Grief*, 522 F.3d 508, 513 (5th Cir. 2008).  Whether a communication is internal or external in nature may also be significant: where "a public employee raises complaints or concerns up the chain of command at his workplace about his job duties," the speech is made pursuant to his official duties, but when an employee "take[s] his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace," these external communications are typically made as a citizen, not an employee.  *Davis*, 518 F.3d at 313 (citing cases); *see also Charles*, 522 F.3d at 514.

Viewing the facts in the record before it in the light most favorable to Plaintiff, the Court cannot conclude as a matter of law that Plaintiff was acting pursuant to his official duties when he engaged in the speech at issue.  First, Plaintiff directed the allegedly protected remarks to Ingram, an external source outside the GPD, *not* to anyone above him in the chain of command. (*See* Plf. Resp. App. at 2, ¶ 4; 5, ¶ 15).  This fact alone distinguishes Plaintiff's case from those cited by Defendants in which courts have determined that plaintiffs were speaking pursuant to their official duties.  (*See* Def. MSJ Br. at 10-12, ¶¶ 24, 27, & 32 (citing *Umoren v. Plano Indep. Sch. Dist.*, 457 Fed. App. 422, 426, 2012 WL 33039, at *2 (5th Cir. Jan. 6, 2012) (substitute teacher's job-related complaints to officials up the chain of command fell within his official

duties); *Davis*, 518 F.3d at 315-16 (same as to state university employee's job-related communications up the chain of command); *Haynes v. City of Circleville*, 474 F.3d 357 (6th Cir. 2007) (same as to internal memorandum complaining about change in training program sent up the chain of command); *Garcetti*, 547 U.S. at 420–24 (same as to prosecutor's memorandum to supervisor)).

Other facts weigh in Plaintiff's favor as well. There is no evidence that the SRO job required Plaintiff to speak out on behalf of retaining, improving, and funding the DARE program. To the contrary, Plaintiff testifies:

> None of my duties as a [SRO] required me to speak about the potential that GCISD would change its curriculum to end the DARE program. . . . None of my duties as a [SRO] required me to speak to any potential change in GCISD curriculum.

(*Id.* at 5, ¶ 13). Nor does the evidence support a determination that the relevant speech was even "closely related" to the SRO job duties, which Plaintiff describes as follows:

> The primary function of the [SRO] at [GMS] was to deter criminal activity at and around the school in both the short-term and the long-term -- through maintaining a visible presence on campus, developing relationships with the children, and acting as a positive influence on the children. . . . The typical daily routine for the [SRO] involved (a) being present for arriving children at the start of the school day, (b) walking the halls, walking campus, and performing office work while children were in class, (c) spending lunch with the children, (d) being present for departing children at the end of the school day, and (e) interacting with and developing relationships with the children each day.
>
> \* \* \* \* \*
>
> The [SRO] also taught a 10 lesson DARE program to 6th grade children at [GMS] and taught a 4 lesson DARE program to 1st grade children at three nearby Grapevine elementary schools. . . . The [SRO] also enforced penal laws on campus[.]

(Plf. Resp. App. at 4, ¶¶ 10-11).[4]   Following this evidence, the only SRO duty that even remotely relates to the allegedly protected speech is the duty to instruct children in the DARE program.  (*See id.*).   While perhaps tangentially related, this teaching function cannot be considered "closely related" to the external advocacy role Plaintiff assumed when he spoke to Ingram.  Additionally, the circumstances of the meeting underscore Plaintiff's claim that he was not speaking as an SRO when he met with Chief Ingram: Plaintiff met with Ingram after hours at Ingram's office at the Colleyville Police Department, wore a DARE t-shirt rather than his SRO uniform, and announced that he was meeting with Chief Ingram as a representative of TDOA, not as a GPD official.  (Plf. Resp. App. at 5, ¶ 15; Def. MSJ App. at 153-54, 157-58, 160); *see, e.g., Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011) (where plaintiff was off duty and out of uniform when he spoke at meeting, record did not support finding that his expression was made pursuant to official duties).  That Salame scolded Plaintiff for talking to Ingram further exemplifies the fact that Plaintiff's speech to Ingram fell outside the scope of his job.  (*See* Def. MSJ App. at 48-49, ¶ 7).

None of the myriad facts cited by Defendants tips the scale in their favor.  While Defendants note that Plaintiff was required to be a member of a law enforcement entity and receive approval from the GPD in order to serve as TDOA treasurer, (*See* Def. MSJ Br. at 9, ¶ 21 (citing Def. MSJ App. at 115, 158)), neither of these facts demonstrates that advocacy of the DARE program to parties outside GCISD was part of Plaintiff's job.  Defendants also reference a 2006-2007 job self-assessment (the "Self-Assessment") in which Plaintiff listed successfully coordinating a TDOA training conference and serving on the TDOA Board as accomplishments

---

[4] Plaintiff's account is consistent with Salame's own description of the SRO position.  (*See Plf. Resp. App.* at 281, 374-75).

and requested that supervisors continue to support the DARE program.  (*See* Def. MSJ Br. at 9-10, ¶ 23 (citing Def. MSJ App. at 21-22)).  At most, this evidence shows that participating in TDOA training and service on the TDOA Board were related to Plaintiff's job; it falls short of showing that promotion of the DARE program to individuals outside of the GPD or GCISD was a part of or "closely related" to SRO functions.  Contrary to Defendants' suggestion, Plaintiff's testimony that Life Skills was counselor-led and that he "had taught [the DARE program] for 16 years, [was] very committed to it, [and was] very passionate about it" yields no insight into whether Plaintiff spoke to Ingram as part of his job.  (*See* Def. MSJ Br. at 10, ¶¶ 23-24 (citing Def. MSJ App. at 129, 165)).  Finally, Plaintiff's admission that he spoke to Hughes, Smith, Salame, Bowling, and Flanagan as a GPD officer is conclusory and does not establish that Plaintiff talked to *Ingram* as a GPD officer.  (*See* Def. MSJ Br. at 9, ¶ 20 (citing Def. MSJ App. at 200)).  Under these circumstances, Defendants are not entitled to a ruling that Plaintiff was acting pursuant to his official duties as a matter of law.

2.      Whether Speech Involved a Matter of Public Concern

A public employee's speech is only constitutionally protected if it "addresses a matter of 'public concern.'"  *Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist.*, 635 F.3d 685, 692 (5th Cir. 2011) (quoting *Connick*, 461 U.S. at 147).  "Matters of public concern are those which can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'"  *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001).  Notwithstanding this principle, even when a public employee's speech relates to a topic of public interest, as is often the case in the public employment setting, it is not considered to be on a "matter of public concern" if the speaker spoke as an employee rather than as a citizen.  *Harris*, 635 F.3d at 692;

*see also Connick*, 461 U.S. at 147.   Speech that is purely on a matter of personal interest is

spoken as an employee and is not constitutionally protected.  *Benningfield v. City of Houston*,

157 F.3d 369, 375 (5th Cir. 1998); *Connick*, 461 U.S. 147–48.   However, "[t]he existence of an

element of personal interest on the part of an employee in the speech does not prevent finding

that the speech as a whole raises issues of public concern."  *Dodds v. Childers*, 933 F.2d 271,

273 (5th Cir. 1991).   Speech that touches both matters of public and personal interest—so-called

"mixed speech"—remains    protected  by  the  First  Amendment  as  long  as  it  was  made

"*predominantly* 'as a citizen.'"  *Harris*, 635 F.3d at 692 (quoting *Dodds*, 933 F.2d at 273)).

In  determining  whether  a  plaintiff  spoke  primarily  as  a  citizen  on  a  matter  of  public

concern  or  as  an  employee  on  a  matter  of  personal  interest,  a  court  must  consider  "the  content,

form,  and  context  of  a  given  statement,  as  revealed  by  the  whole  record."  *Connick*,  461  U.S.

147–48; *Fiesel v. Cherry*, 295 F.3d 664, 668 (5th Cir. 2002).[5]  These factors "must be considered

as  a  whole  package,  and  [their]  significance . . .  will  differ  depending  on  the  circumstances  of  the

particular  situation."   *Moore v. City of Kilgore*, 877 F.2d at 370 (5th Cir. 1989).   The Fifth

Circuit has recognized "three reliable principles" derived from its caselaw regarding whether

public employee speech is made as a citizen on a matter of public concern:

> First, the content of the speech may relate to the public concern if
> it does not involve solely personal matters or strictly a discussion
> of management policies that is only interesting to the public by
> virtue of the manager's status as an arm of the government.   If
> releasing the speech to the public would inform the populace of
> more than the fact of an employee's employment grievance, the
> content of the speech may be public in nature.   Second, speech
> need not be made to the public, but it may relate to the public
> concern if it is made against the backdrop of public debate.   And

---

[5] The Fifth Circuit has emphasized that the content-form-context test is to be used where, as here, mixed speech is at issue.  *Teague v. City of Flower Mound*, 179 F.3d 377, 382 (5th Cir. 1999).

> third, the speech cannot be made in furtherance of a personal
> employer-employee dispute if it is to relate to the public concern.

*Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 372 (5th Cir. 2000) (citing

cases), *abrogated on other grounds by Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).   In

accordance with these precepts, the Fifth Circuit has noted that speech regarding "internal

personnel disputes and working conditions" will not ordinarily involve the public concern.   *See*

*Alexander v. Eads*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Branton*, 272 F.3d at 739).

a.      The Content of the Speech

Turning first to the content of the speech, Plaintiff discussed "retaining the DARE

program, working to improve the DARE program. . . and funding for the DARE program[.]"

(*See* Plf. Resp. App. at 5, ¶ 15).   There is no doubt that a discussion of curricular changes within

a public school district is socially significant and of interest to the public.   *See Chiu v. Plano*

*Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003) (ruling, outside public employment context,

that change in public school curriculum constituted matter of public concern).   Further, the topics

discussed were not solely personal or employment-related.   The comments did not touch on any

specifics related to Plaintiff's job and, in fact, could have been made by a DARE program

advocate employed outside the GPD.   Plaintiff was not discussing management policies, working

conditions, or an employer-employee dispute particular to him, but a potentially broad school

curriculum change that would affect an entire school district.   As such, if released to the public,

Plaintiff's comments would have informed the public of far more than a single individual's work-

related concerns.   Defendants point out that Plaintiff did not specifically address the Life Skills

program (*see* Def. MSJ App. at 11, ¶ 28), but this fact does not render the contents of Plaintiff's

speech any more personal or private.   To be sure, the outcome of the decision to discontinue the

DARE program might have ultimately affected some of Plaintiff's job functions.   But, considering the *Kennedy* factors, the content of Plaintiff's speech indicates that he spoke primarily as a citizen.   *See Kennedy*, 224 F.3d at 372; *see also, e.g., Moore*, 877 F.2d at 370-71 (plaintiff firefighter's comments concerning possible shortage of firefighters constituted matter of public concern because it was a matter in which the public was highly interested and in which plaintiff had an interest in speaking as a citizen); *see, cf.*, *Harris*, 635 F.3d at 638 (school secretary's complaints about the treatment of her son found not to be speech on a matter of public concern).

b.      The Form of the Speech

Looking to form, the speech was an oral communication during a meeting between Plaintiff and Ingram, in Ingram's office.  (*See* Plf. Resp. App. at 5, ¶ 15).  Although the meeting was between only these two individuals, "a public employee does not lose constitutional protection for his or her speech because the speech was made privately."  *Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 466 (5th Cir. 1990) (citing *Rankin v. McPherson*, 483 U.S. 378, 378 (1987)).   Given the clear direction provided by the content and context factors, the form of the speech is not significant in this case.  *See, e.g.*, *id.*, 901 F.2d at 465 (where content of speech addressed matters of public concern, fact that speech took form of internal grievances did not "necessitate a finding that [plaintiff's] alleged speech was not connected to matters of public concern").

c.      The Context of the Speech

Regarding context, Plaintiff's speech was directed at an individual who did not work for Plaintiff's employer and had no direct role in Plaintiff's employment.  (*See id.* at 2, ¶ 4; 5, ¶ 15).

Given these circumstances, it is clear that Plaintiff's comments were not made in the course of a purely personal employer-employee dispute. Plaintiff submitted with his papers an August 10, 2009 article from the *Fort Worth Star-Telegram*—written within four months after he made his comments—GCISD's decision to drop the DARE program, and noting that GCISD was the "latest North Texas school district" to drop out of the program. (*See* Plf. Resp. App. at 82-84). This press coverage indicates that Plaintiff's comments were made "against the backdrop of public debate." *Kennedy*, 224 F.3d at 372. Finally, Plaintiff told Ingram he was acting as a TDOA representative, wore a DARE t-shirt rather than his police uniform, and met with Ingram while off-duty. (*See id.* at 5, ¶ 15). These facts suggest that Plaintiff was speaking as a TDOA representative—*not* as an employee of the GPD.

Defendants concede that the evidence shows that "Plaintiff was (at most) speaking as a Board Member/Treasurer of the TDOA[.]" (Def. MSJ Br. at 9, ¶ 21). Yet they appear to be arguing that speaking as a TDOA Board member is tantamount to commenting as an employee for purposes of a "public concern" inquiry. (*See id.* at 9-10, ¶¶ 21-23). The Court disagrees. None of the evidence cited by Defendants in support of this proposition—neither testimony that Plaintiff had to seek permission from the GPD to serve on the TDOA Board and had to be a law enforcement officer to join TDOA, nor the Self-Assessment reporting his involvement in TDOA activities—comes close to establishing that being a TDOA member equates to being an SRO or even that the interests of the two positions are aligned. (*See id.* (citing Def. MSJ App. at 21-22, 115, 158)). Significantly, Defendants have not cited any caselaw for the proposition that speaking out on behalf of an outside organization equates to speaking as an employee, and the Court has not located any. To the contrary, in the analogous setting of employee unions, courts

have held that speech and activities undertaken by employees on behalf of unions raise issues of public concern. *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999) (speech advocating union involved a matter of public concern); *Castagliuolo v. Danaher*, No. 3-09-cv-418 (VLB), 2011 WL 1220595, at *13 (D. Conn. Mar. 29, 2011) (holding defendants retaliated against plaintiffs for their union organizing activities, not for "personal complaints about the terms of their employment[,]" and, therefore, plaintiffs satisfied the "public concern" requirement of a First Amendment retaliation claim).

Defendants make a variety of other context-related arguments. They highlight Plaintiff's testimony that he "taught [DARE] for 16 years, [was] very committed to it, [and was] very passionate about it[.]" (Def. MSJ Br. at 7, ¶ 16, *citing* Def. MSJ App. at 165). To the extent Defendants are arguing that Plaintiff's personal passion for, and commitment to, the DARE program divests his speech of First Amendment protection, this argument fails. The distinction to be drawn in a public employment case is between speech made as a citizen and speech made as an employee. *Harris*, 635 F.3d at 692. Being personally passionate about a public cause does not make a person any more likely to have been motivated to speak as an employee; in fact, the opposite may be true. Plaintiff's deposition statement that he spoke to Hughes, Smith, Salame, Bowling, and Flanagan as a GPD officer does not relate to Plaintiff's discussion with Ingram, which took place under different circumstances. Finally, the fact that Plaintiff knew the Life Skills program was counselor-led, rather than officer-led, is not particularly germane. (*See* Def. MSJ Br. at 9-10, ¶ 23). While this evidence suggests that Plaintiff's job duties might change upon elimination of the DARE program, the focus of Plaintiff's speech was not on those duties,

but on a public school program for which he was a staunch advocate.  Looking to the record as a whole, the context factor weighs in Plaintiff's favor.

d.      Outcome of Content-Form-Context Review

Although the form of the communication was not public, the content and context of Plaintiff's communication to Ingram reveal that he was speaking as a TDOA Board member—a citizen—on a matter of public concern.  Accordingly, the Court rejects Defendants' position that, as a matter of law, Plaintiff did not speak as a citizen on a matter of public concern as a matter of law.

3.      Whether Plaintiff's Interest in Speaking Outweighed His Employer's Interest in Promoting Workplace Efficiency

Even if a public employee speaks on a matter of public concern, his speech is not protected unless the employee's interest in expressing himself on the matter outweighs the government's interest in promoting the efficiency of its public services.  *See Pickering v. Board of Education*, 391 U.S. 563, 568 (1968).  To resolve this issue, the court performs a balancing test that "in reality is a sliding scale or spectrum upon which 'public concern is weighed against disruption'" to the government's interest in efficient operation.  *Vojvodich v. Lopez*, 48 F.3d 879, 885 (5th Cir. 1995) (quoting *Click v. Copeland*, 970 F.2d 112, 112 (5th Cir. 1992) (internal quotations omitted)).  "The more central a matter of public concern is to the speech at issue, the stronger the employer's showing of counter-balancing governmental interest must be."  *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991) (citing cases).  In weighing the parties' competing interests, the Court considers, among other things:

> (1) the degree to which the employee's activity involved a matter of public concern; (2) the time, place, and manner of the employee's activity; (3) whether close working relationships are

> essential to fulfilling the employee's public responsibilities and the
> potential effect of the employee's activity on those relationships;
> (4) whether the employee's activity may be characterized as
> hostile, abusive, or insubordinate; and (5) whether the activity
> impairs discipline by superiors or harmony among coworkers.

*Jordan v. Ector County*, 516 F.3d 290, 299 (5th Cir. 2008) (quoting *Brady v. Fort Bend County*,

145 F.3d 691, 707 (5th Cir. 1998)).

As discussed above, Plaintiff's speech regarding the DARE program involved a matter of

public concern.  Moreover, Plaintiff engaged in the discussion after hours in a private office,

specified that he was not acting as a representative of the GPD, and was neither hostile nor

abusive.  (Plf. Resp. App. at 5, ¶ 15).  Given the public interest in the subject matter of Plaintiff's

speech and the relatively benign circumstances under which it was made, Defendants' burden of

showing operational disruption is considerable.

Defendants fail to meet such burden.  There is no evidence that Plaintiff's speech caused

any actual disruption in Plaintiff's workplace.  Nor is there evidence that the conversation at

issue had a real potential to affect his working relationships, or that it impaired harmony or

discipline.  Contrary to Defendants' suggestion, neither Plaintiff's admission that breaking the

chain of command "[c]ould" disorganize a department, (*see* Def. MSJ Br. at 14, ¶ 35 (citing Def.

MSJ App. at 192)), nor his agreement that "there is some type of business that a police chief

could ask his officers not to mention," (*see id.* at ¶ 37 (citing Def. MSJ App. at 171)), suggests

that the speech in question had any potential or actual disruptive impact on GPD operations.

Salame's subjective belief that Plaintiff would not support a curriculum change also fails to

demonstrate any disruptive impact.  (*See id.* at ¶ 36 (citing Def. MSJ App. at 49, ¶ 7)); *see, e.g.,*

*Salge*, 411 F.3d at 196 (government employer's failure to present evidence of actual disruption

beyond single supervisor's testimony weighed in favor of plaintiff).  Although Defendants assert

that Plaintiff was "insubordinate" (Def. MSJ Br. at 14, ¶ 35), their evidence does not establish as

a matter of law that Plaintiff violated an extant policy or order.  Instead, Defendants present a

"Letter of Reprimand" to Plaintiff, dated December 23, 1998, that states, in pertinent part:

> On September 28, 1998, Captain Salame issued a direct order via
> memorandum admonishing you from discussing your concerns
> and/or grievances regarding Departmental issues among agencies
> or members of this community.  At that time, you were further
> instructed to utilize the chain of command as the proper forum to
> air those concerns.

(Def. MSJ App. at 9).  Even assuming the order referenced in the "Letter of Reprimand" was still

in effect when Plaintiff engaged in the allegedly protected speech nearly a decade later, it is not

at all clear that the DARE program and its place in the GCISD curriculum constitute

"Departmental issues" whose discussion was prohibited under the policy.[6]  Furthermore, even if

the speech violated that directive, it was not so public or damaging as to hinder GPD's

operations.  *See, contra, Nixon v. City of Houston*, 511 F.3d 494, 500-01 (5th Cir. 2007) (where

patrolman published articles as an officer that contained caustic comments about citizenry, police

department's activities could be impaired).  On balance, Plaintiff's interest in speaking in favor of

the DARE program outweighed the City's interest in providing services efficiently.  Therefore,

Defendants are not entitled to summary judgment on this ground.

4.      Whether Plaintiff Suffered an Adverse Employment Action

Defendants also contend that Plaintiff's transfer did not constitute an adverse employment

action within the meaning of section 1983.  As the Fifth Circuit observed more than a decade

---

[6] The letter was unrelated to the DARE program, but instead involved Plaintiff's "discontent"
with how a Santa Cops program operated by the GPD was being run.  (Def. MSJ App. at 9).

ago, for purposes of a section 1983 claim, a transfer that serves as a demotion qualifies as an adverse employment action.  *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999).   "To be equivalent to a demotion, a transfer need not result in a decrease in pay, title or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement."  *Id.* (citing *Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir. 1996)); *Click*, 970 F.2d at 109; *accord Alvarado v. Tex. Rangers*, 492 F.3d 605, 612-13 (5th Cir. 2007).   However, it is not enough to show that the plaintiff had a personal preference or subjective perception that a demotion has occurred.  *Forsyth*, 91 F.3d at 774.   Rather, he must show that the transfer caused him to suffer some objective harm "sufficiently serious to constitute a constitutional injury."  *Serna v. City of San Antonio*, 244 F.3d 479, 483 (5th Cir. 2001) (quoting *Breaux v. City of Garland*, 205 F.3d 150, 152 (5th Cir. 2000)).[7] Whether a transfer is objectively worse is a question of fact.  *See, e.g.*, *Sharp*, 164 F.3d at 933.

Viewed in the light most favorable to Plaintiff, the summary judgment evidence supports an inference that the position of patrol officer is "objectively worse" than the position of SRO in terms of schedule, duties, and prestige.  Plaintiff testifies that the SRO position operated on a regular Monday-through-Friday schedule, with weekends and holidays off.  (*See* Plf. Resp. App. at 4, ¶ 12).  By contrast, as a patrol officer, Plaintiff had to work every Saturday and typically had to work on holidays when a holiday fell during his assigned shift.  (*See* Plf. Resp. App. at 8,

---

[7] The Court notes that, in the context of Title VII retaliation claims, the Supreme Court has broadened the meaning of "adverse employment action" to include any action that might dissuade a reasonable worker from making a charge of discrimination or sexual harassment. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  The Fifth Circuit has not yet addressed whether this broader standard applies to section 1983 retaliation claims. As Plaintiff satisfies the higher standard outlined in *Sharp* in any event, the Court need not decide whether a looser standard may apply.

¶ 24).  Plaintiff further attests that the duties associated with the patrol officer position were more

dangerous than those performed by an SRO:

> As a patrol officer after the transfer, my duties generally included
> answering calls for service, enforcing laws, and patrolling to deter,
> spot, and stop criminal activity.  These duties were dangerous due
> to the nature of the duties I performed and the situations that I
> encountered.  For example, even driving a patrol vehicle as a patrol
> officer was more dangerous than walking patrol as a [SRO]. . . .
> Patrol officers, including me, faced a variety of other situations
> that involved the risk of injury or death – traffic stops, domestic
> violence situations, criminals who did not want to be apprehended,
> suspects who decided to fight, and situations involving drug use or
> drug offenses. . . .While I did not regularly face each one of these
> situations as a patrol officer, I faced some situations as a patrol
> officer that involved risk of injury or death far more often than I
> did as a [SRO].

(Plf. Resp. App. at 8, ¶ 25).  He also explains that patrol officer duties were more physically

taxing than SRO duties:

> As a patrol officer after the transfer, patrol officer duties were also
> more physically demanding than the [SRO] duties, due to the
> nature of the situations encountered.  Patrol officers, including me,
> sometimes had to chase the person who did not want to be
> apprehended, sometimes had to appropriately restrain someone
> larger, heavier, stronger, or younger than the responding officer,
> and sometimes had to physically assist someone who was seriously
> injured or otherwise needed physical assistance.  Although these
> situations did not happen all the time, I faced these situations far
> more often as a patrol officer than as a [SRO].
>
> As a patrol officer after the transfer, patrol officer duties were also
> more physically demanding than the [SRO] duties, due to the
> nature of the driving involved. . . . Like driving for long periods of
> time on a trip, the driving was draining and became physically
> uncomfortable.

(Plf. Resp. App. at 8, ¶¶ 26-27).  Finally, in an affidavit, Robert Wall, a former Administrative

Sergeant for the GPD Patrol Division, testifies that "[t]he position of patrol officer was normally

the entry-level position for a police officer," (*id.* at 59, ¶ 4), indicating the patrol officer job was associated with a lower level of prestige than the SRO position.

Contrary to Defendants' suggestion, the fact that Plaintiff did not lose rank, pay, benefits, seniority, status, or grade as a result of his transfer, (*see* Def. MSJ Br. at 15, ¶ 40), does not preclude him from establishing the transfer was an adverse employment action. *See Sharp*, 164 F.3d at 933.  Nor does the fact that Plaintiff, while an SRO, performed patrol duties when school was out (Def. MSJ Br. at 15, ¶ 40; Def. MSJ App. at 92; *see* Plf. Resp. App. at 4, ¶ 12), foreclose a finding that the transfer was an adverse employment action.  Construing the evidence in Plaintiff's favor, the transfer still substantially increased the amount of time plaintiff had to spend performing less desirable job duties, caused him to work more Saturdays and holidays, and cast him into an entry-level position.  (*See* Plf. Resp. App. at 4, ¶ 12; 8, ¶ 24; 59, ¶ 4).  Other facts cited by Defendants—that the physical fit-for-duty requirements for the SRO position were the same as those for a patrol officer, that Plaintiff never requested a transfer, never requested an accommodation, never complained of spinal injuries, never requested a larger vehicle, waited almost nine months to file a grievance for reinstatement, and waited almost two years to seek time off under the Family Medical Leave Act—are wholly irrelevant to the question of whether the patrol officer job was "objectively worse" than the SRO position.  (*See* Def. MSJ Br. at 16, ¶ 41 (citing Def. MSJ App. at 49, ¶ 9; 76-77)).  In sum, at the very least, a fact question exists as to whether Plaintiff's transfer to patrol duties constituted an adverse employment action.  *See, e.g., Watts v. City of Jackson*, 827 F.Supp.2d 724, 732 (S.D. Miss. 2011) (question of fact existed regarding whether transfer constituted adverse employment action where evidence showed that original shift was during the day Monday through Friday, but new shift was graveyard shift and

required work on weekends, was in more dangerous area, and   precluded overtime opportunities).

5.     Whether the Adverse Action Was Substantially Motivated by the Protected Speech

Defendants only cursorily assert that Plaintiff is unable to show that the adverse action was motivated by his protected speech.  (*See* Def. MSJ Br. at 16-17, ¶ 43).  Their contentions regarding the causation element are really no more than a reiteration arguments relevant to other elements of Plaintiff's free speech retaliation claim.  Defendants have not fully briefed the issue of causation, and the Court finds that they have not definitively disproven it as a matter of law.

B.     Defendants' Liability under Section 1983

To state a claim under section 1983, a Plaintiff must show: (1) a violation of the Constitution or of federal law; and (2) the violation was committed by someone acting under color of state law.  *See Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252-53 (5th Cir. 2005) (citing cases). Regarding Salame, Defendants concede that he was acting under color of state law.  (*See* Def. MSJ Br. at 17, ¶ 45).  However, again attacking the elements of Plaintiff's section 1983 free speech retaliation claim, they allege that Salame's transfer of Plaintiff was not unconstitutional.  (*See id.*).  As the Court has already determined that Plaintiff has produced sufficient evidence to support his free speech retaliation claim, it determines that Salame, who ordered the allegedly unconstitutional transfer, (*see* Def. MSJ App. at 29), may be held liable under section 1983.

The court reaches a different conclusion with regard to the City.  "It is well-established that a city is not liable under § 1983 on the theory of respondeat superior." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009), *cert. denied*, 131 S.Ct. 66 (2010), *citing Monell v.*

*Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978).  A municipality may be held liable for the deprivation of rights guaranteed by the Constitution or federal law only if the deprivation was the result of an official policy, which may be represented either by a policy or custom.  *See Monell*, 436 U.S. at 693.  The plaintiff must show that: (1) the municipality had a policy or custom, of which (2) a municipal policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation was the moving force behind the policy or custom. *See World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 752-53 (5th Cir. 2009).  Where an unwritten policy or custom is at issue, the plaintiff must demonstrate that the practice is so "persistent and widespread" as to constitute "permanent and well settled" policy. *Monell*, 436 U.S. at 691.  An isolated incident is typically not enough.  *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002).  Instead, a plaintiff must demonstrate a pattern of wrongs that are both sufficiently numerous and sufficiently similar and specific to the one that caused the plaintiff's injuries.  *See Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005); *Piotrowski v. City of Houston*, 237 F.3d 567, 581-82 (5th Cir. 2001); *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989).

A "single decision" by a policymaker may constitute official policy, but only in the "extremely narrow" circumstance in which the decisionmaker is also a "final policymaker." *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008) (citing *Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005)).  A policymaker has "the responsibility for making law or setting policy in any given area of local government's  business."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988).  "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  *Pembaur v.*

*Cincinnati*, 475 U.S. 469, 481 (1986).  Courts look to state and local law to determine whether an official possesses final policymaking authority.  *Id.*

The Court initially observes that, rather than identifying specific facts to support his claim against the City, Plaintiff directs the Court to his entire "Response," a 43-page document containing more than 300 record citations.  (*See* Plf. Resp. Br. at 16; *see also* Plf. Resp. at 1-43). "It is well settled that the court is not obligated to comb the record in search of evidence that will permit a nonmovant to survive summary judgment."  *Reneker v. Offill*, No. 3-08-CV-1394-D, 2012 WL 2158733, at *8 (N.D. Tex. Jun. 14, 2012) (citing cases).  "Rule 56 does not impose a duty on the district court to sift through the record in search of evidence to support a party's opposition."  *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463 (5th Cir. 1996) (citing *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996)).  Rather, Rule 56 "saddles the non-movant with the duty to 'designate' the specific facts in the record that create genuine issues precluding summary judgment[.]" *Jones*, 82 F.3d at 1338 (citing cases).  The Local Rules further require that, "[w]hen citing materials in the record, as required by Fed. R. Civ. P. 56(c)(1)(A) or (B), a party must support each assertion by citing each relevant page of its own or the opposing party's appendix."  *See* N.D. Tex. Civ. R. 56.5(c).  Having failed to designate any specific facts in the record, Plaintiff has not discharged his summary judgment burden.

Moreover, even considering the facts presented in Plaintiff's response, there is no basis for municipal liability.  Plaintiff does not point to any written policy that was the "moving force" behind the transfer decision.  Instead, he notes the absence of City policies constraining transfers and prohibiting First Amendment retaliation.  (Plf. Resp. at 38 (citing Def. MSJ App. at 237, 291, 434)).  Courts have recognized two circumstances in which the absence of a policy may be

actionable: (1) "where the absence was intended by the municipality to avoid liability," *Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377, 381 n.14 (5th Cir. 2007) (citing *Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993)); and (2) where a municipality has "actual or constructive notice" that failure to enact the policy is "substantially certain to result in a constitutional violation." *Fourhorn v. City and County of Denver*, No. 08-cv-1693-MSK-KLM, 2009 WL 2407569, at *4 (D. Colo. Aug. 3, 2009).  Plaintiff fails to present evidence that either of these liability-triggering scenarios existed.

Plaintiff does allege that the GPD had an *unwritten* policy of "Punishment for Speaking Outside Chain of Command."  (Plf. Resp. at 18).  As support for this claim, Plaintiff first cites affidavit testimony from the aforementioned Wall, who served as a GPD police officer from April 1983 until September 2008.  (Plf. Resp. App. at 58, ¶ 2).  According to Wall:

> While Chief Salame was the Police Department Chief, I observed that police officers who spoke outside the chain of command on any issue that might remotely affect the Police Department were punished.  To a large extent, the more controversial the issue, the more restrictive the practice was with respect to efforts to stop speech outside the chain of command.  It was common knowledge that an unwritten rule prohibited speech outside the chain of command on any issue that might even be tangentially related to the Police Department.  The unwritten rule pre-date [*sic*] Chief Salame as the Police Department Chief and continued throughout my tenure with the Police Department.

(Plf. Resp. App. at 61, ¶ 14).  However, Wall fails to identify any of the punished officers, describe the subject matter of their speech or the alleged punishments with any specificity, or state when the retaliatory acts allegedly occurred.  His vague and conclusory affidavit is insufficient to present a fact issue on summary judgment.  *See, e.g. Barrett v. Kocher*, 127 Fed. Appx. 697, 698-99, 2005 WL 752780, at *2 (5th Cir. Apr. 4, 2005) (affidavit of plaintiff inmate's

fellow trial detainee attesting that he witnessed plaintiff's beating, had been beaten several times himself, and had witnessed beating of other inmates insufficient to create genuine issue of fact as to whether custom of using excessive force existed where detainee failed to identify dates of other attacks, names of attackers, or circumstances of the attacks).   Plaintiff also references the deposition testimony of Sue Hanley, a GPD sergeant formerly above him in the chain of command.  (*See* Plf. Resp. at 19 n.140 (citing Plf. Resp. App. at 198-99).   When asked whether, during her tenure at the GPD, it had "always been the case that police officers are not to speak about any issues concerning work or department programs or programs in which the department has a partial role outside the chain of command," Hanley responded:

> There's a level in which discussion about internal issues should be kept internal.   In other words, we don't preclude officers from speaking with wives or spouses or someone who may need to vent, but the process of going outside that chain of command if you have an issue that you're trying to resolve and you're using external forces to get that resolved versus the internal forces then that becomes that line where one should not cross, venting versus resolve.   There is a time and a place to vent and resolve needs to stay within the department, as well as, some of the venting because what we're trying to maintain is unity, cohesiveness.
>
> Those kinds of things that keep our department functioning properly because taking things outside the department could appear like we're not taking care of our issues, we're not policing ourselves, we're not being professional, when in fact, if you take them outside of the department versus keeping them inside, we don't get the opportunity to review those items that you're upset about, and we don't get the chance to fix our issues before outside agencies or entities get involved and that makes us look very unprofessional.

(Plf. MSJ App. at 198-99).  Even if Hanley's statements constitute an admission that the GPD had an unwritten policy of discouraging speech on department-related issues, they do not prove that Hanley or anyone else engaged in behavior similar to that alleged here, *i.e.*, retaliating

against someone for exercising his right to free speech by committing an adverse employment action.[8]   Without such evidence, Plaintiff cannot establish municipal liability.   *See Jeanty v. County of Orange*, 379 F.Supp.2d 533, 545 (S.D.N.Y. 2005) (citing *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 122 (2d Cir. 1991) ("for a plaintiff's claim of custom or policy to survive summary judgment review, there necessarily must be evidence of the complained-of activity by defendants in similar circumstances outside of the present case")).

To the extent Plaintiff is arguing that liability against the City may be established through Salame's single, allegedly unconstitutional act because Salame qualifies as a "final policymaker," Plaintiff has not shown that this "extremely narrow" exception applies.   *See, e.g., Bolton*, 541 F.3d at 548.   The City's charter provides, "All powers of the city, and the determination of all matters of policy, shall be vested in the City Council."   (Def. MSJ App. at 3).   Plaintiff himself acknowledges that the City Manager's office had the "final word" on City personnel policies. (*See* Plf. Resp. at 34 (citing Plf. Resp. App. at 348)).   Moreover, the City remained in ultimate control even of individual personnel decisions.   According to Salame:

> At the end of the day, you know, personnel status change needs to be submitted up the chain of command through the city manager's office, you know, I guess they could make changes if they felt compelled to do that.

(Plf. Resp. App. at 317).   This evidence plainly demonstrates that Salame did not have final authority to establish municipal policy with respect to Plaintiff's transfer as required to show policymaker status under *Pembaur*.   *See, e.g.*, 475 U.S. at 481.   The fact that the City never

---

[8]   Plaintiff makes mention of the fact that GPD employees Terry Wilson and James Donaldson were subjected to transfers aimed at forcing them into retirement.   (*See* Plf. Resp. at 29 (citing Plf. Resp. App. at 60, ¶ 11)).   However, he presents no facts to show that either Wilson or Donaldson was transferred for exercising the right to free speech.   Therefore, these transfers cannot be used to support a finding that a policy or custom of free speech retaliation existed.

exercised its right to overturn Salame's decisions, (*see* Plf. Resp. at 35 (citing Plf. Resp. App. at 317)), is immaterial.   The relevant question is whether the City had the authority to guide Salame's discretion, not whether it actually did so.   *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 129–30 (1988).   In short, the facts show, at most, that Plaintiff's transfer resulted from a single decision by Salame, not a policy or custom attributable to the City.   Therefore, although not entitled to summary judgment with regard to their contention that Salame is not liable under section 1983, Defendants are entitled to summary judgment with regard to their claim that the City is not subject to section 1983 liability.

C.      Qualified Immunity

Salame also raises the affirmative defense of qualified immunity.   "Qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Winston v. City of Shreveport*, 390 Fed. Appx. 379, 383, 2010 WL 3190709, at *3 (5th Cir. Aug. 12, 2010), *quoting Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   A plaintiff must satisfy a two-prong test in order to overcome a qualified immunity defense.   First, the plaintiff must show "that the official violated a statutory or constitutional right."  *Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011).   Second, he must show that "the right was 'clearly established' at the time of the challenged conduct."  *Id.* (quoting *Harlow*, 457 U.S. at 818).

As the court has already found that Plaintiff has submitted enough evidence to demonstrate the violation of a constitutional right, it need only focus on the question of whether the right was "clearly established" at the time of the alleged violation.   "A government official's

conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"  *al-Kidd*, 131 S.Ct. at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Conversely, an official's conduct does not violate clearly established law if a reasonable official could have believed his conduct was lawful.  *Anderson*, 483 U.S. at 641.  The critical question is whether the state of the law at the time gave the official "'fair warning'" that his act was unconstitutional.  *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  A "'case directly on point'" is not required.  *Id.* at 412 (quoting *al-Kidd*, 131 S.Ct. at 2083).  "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope*, 536 U.S. at 741.  A court must ask "'not only whether courts have recognized the *existence* of a particular constitutional right, but also . . . whether that right has been defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct.'"  *Morgan*, 659 F.3d at 372 (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 331 (5th Cir. 2002) (en banc)).

At the time of the alleged violation, it had long been clearly established that the First Amendment prohibits a public employer from retaliating against an employee for speaking on a matter of public concern.  *See Blackwell v. Laque*, 275 Fed. Appx. 363, 370, 2008 WL 1848119, at *6 (5th Cir. Apr. 24, 2008); *Tompkins v. Vicker*, 26 F.3d 603, 606 (5th Cir. 1994).  Salame does not contest this clear precedent, but instead primarily argues that the law was unclear as to whether Plaintiff's speech was excepted from this rule because he was speaking pursuant to his official duties and/or as an employee on a personal job matter.  (Def. MSJ Br. at 20-21, ¶ 54). Thus, the salient question is whether, given the law in effect at the time Salame made the

decision to transfer Plaintiff in June 2009, a reasonable official in Salame's position *could have* believed that Plaintiff had spoken pursuant to his official duties and/or as an employee on a private matter.  (*See* Plf. Resp. App. at 7, ¶ 22; Def. MSJ App. at 29); *see also Anderson*, 483 U.S. at 641.

By the summer of 2009, when the alleged violation occurred, the Supreme Court and Fifth Circuit had explained that speech was not constitutionally protected if made "pursuant to official duties."  *Williams*, 480 F.3d at 692-93; *see also Garcetti*, 547 U.S. at 421–22; (*see* Def. MSJ App. at 29 (transfer ordered June 29, 2009)).  The Fifth Circuit had further defined "pursuant to official duties" as "activities undertaken in the course of performing one's job."  *Davis*, 518 F.3d at 313.  And it had clarified that an employee making external communications is typically not speaking "pursuant to official duties."  *Id.*  As discussed above, the evidence plainly shows that Plaintiff was not speaking to Ingram in the course of performing his job.  (*See infra* pp. 6-10).  Under the circumstances previously described, no reasonable official in Salame's position could have believed that advocating for the DARE program, to the Chief of Police of another city, was a part of Plaintiff's SRO job.  Indeed, Salame criticized Plaintiff for engaging in the communication.  (*See* Def. MSJ App. at 48-49, ¶ 7).  The law clearly established that Plaintiff was not speaking pursuant to his official duties when he met with Ingram.

The law was also clear as of 2009 that a public employee's speech as a citizen on issues of public concern, even if mixed with personal issues, was protected by the First Amendment and that courts should look to content, form, and context of the speech to evaluate this question.  *Connick*, 461 U.S. at 146–47; *Dodds*, 933 F.2d at 273.  The Court has already determined that Plaintiff was speaking as a citizen on a matter of public concern under the current law, and the

law regarding this matter has been relatively unchanged since 2009.  *See infra* pp. 10-16.  Nor does this case present a close call.  To the contrary, as noted above, every one of the Fifth Circuit's *Kennedy* factors, promulgated in 2000, weighs in Plaintiff's favor.  *See id.*; *Kennedy*, 224 F.3d at 372.  Even Defendants concede that the evidence could show that Plaintiff was speaking as a TDOA Board member.  (Def. MSJ Br. at 21).  Yet the Fifth Circuit has never held that speech made on behalf of an organization external to one's employment is made as an employee rather than as a citizen.  Moreover, the subject matter of Plaintiff's speech—advocacy for a public program—fell  well outside the ambit of "personal" employment matters that, to that point, the Fifth Circuit had ruled were unprotected.  *See, e.g.*, *Salge*, 411 F.3d at 186 (describing employment matters not protected under First Amendment as "personal matters such as personnel and employment disputes").  Thus, a reasonable official would have determined that Plaintiff's speech was made as a citizen on a matter of public concern and, hence, protected.  *See, e.g., Jones v. Turner*, No. 10-0235, 2011 WL 4406349, at *5 (W.D. La. Sept. 21, 2011) (denying qualified immunity and finding law clearly established where Fifth Circuit had never ruled that speech similar to that uttered by plaintiff was not protected).

Salame additionally appears to contend that the 2009 law did not give adequate notice that a transfer could constitute an adverse action even if it did not reduce rank, pay, benefits, seniority, status, and/or grade.   (Def. MSJ Br. at 21, ¶ 54).   This argument is specious.  Approximately ten years before Salame's alleged violation, the Fifth Circuit held that a transfer could be an adverse employment action if it was "objectively worse," even if it did not "result in a decrease in pay, title or grade[.]"  *Sharp*, 164 F.3d at 933.  The Fifth Circuit elaborated by stating that a position could be "objectively worse" if "less prestigious or less interesting or

providing less room for advancement." *Id.* Given this clear precedent, any reasonable official in Salame's position would have known that a transfer could be considered unlawful even if it did not affect rank, pay, benefits, seniority, status, or grade. Accordingly, Salame is not entitled to qualified immunity with regard to Plaintiff's First Amendment retaliation claim.

## IV.   ANALYSIS REGARDING PLAINTIFF'S MOTION

Plaintiff attacks several affirmative defenses raised by Defendants as either not cognizable as a matter of law or lacking factual support. (Plf. MPSJ at 1-2). Defendants do not contest Plaintiff's motion with regard to three sets of defenses: (1) the "whistleblower defenses" under the Texas Whistleblower Act, TEX. GOV'T CODE § 554.001, *et seq.*, described in Defendants' amended answer as "the defense provided by Tex. Gov't Code § 554.004(b)" and "the damages caps set forth in Tex. Gov't Code § 554.003(c);" (2) the "unspecified damages caps" defense, described in Defendants' amended answer as "all other applicable damages caps, including, but not limited to, those limiting damages because Defendants are governmental entities and based on the number of persons employed by Defendants;" and (3) Salame's "official" and "legislative" immunity defenses. (*See* Plf. MPSJ at 3-4, 7 (citing Def. First. Am. Orig. Ans. [Doc. #40] at 6, ¶¶ 76, 78, 82-83); Def. MPSJ Resp. at 3, 6-7)). Plaintiff's motion is granted with regard to these defenses.

The remaining defenses targeted by Plaintiff relate to immunity. Specifically, Plaintiff disputes whether the City is entitled to "sovereign, governmental and/or individual official, qualified and legislative immunities from this suit, liability and/or damages." (Plf. MPSJ at 4 (citing Def. First Am. Orig. Ans. [Doc. #40] at 6, ¶ 76)). Because the Court has already determined that the City is not subject to liability under section 1983, Plaintiff's motion is denied

as moot with regard to the City's immunity claims.   Plaintiff also seeks summary judgment with regard to Salame's defense of derivative sovereign immunity on the ground that the City is not protected by sovereign immunity and, therefore, no derivative sovereign immunity can pass to Salame.   (*See* Plf. MPSJ at 5-6).   Plaintiff's point is well taken.   The Supreme Court has repeatedly recognized that sovereign immunity does not protect municipalities from suits brought under section 1983.   *See Howlett v. Rose*, 496 U.S. 356, 376 (1990) ("By including municipalities within the class of 'persons' subject to liability for violations of the Federal Constitution and laws, Congress—the supreme sovereign on matters of foreign law—abolished whatever vestige of the State's sovereign immunity the municipality possessed.") (quoting *Owen v. City of Independence*, 445 U.S. 622, 647-48 (1980) (footnote omitted)).   Because the City itself does not enjoy sovereign immunity, Salame cannot "derive" any sovereign immunity from it.   *See, e.g., Harding v. Gray*, No. 6-01-CV-050-C, 2004 WL 893657, at *5 (N.D. Tex. Apr. 27, 2004) (individual defendants sued in official capacities not entitled to assert sovereign immunity defense to section 1983 complaint because county employer not shielded by sovereign immunity).   Accordingly, Plaintiff's motion is granted with respect to Salame's derivative sovereign immunity defense.

## CONCLUSION

For the reasons stated above, Defendants' Rule 12(b)(6) Motion To Dismiss, or in the Alternative, Traditional/No Evidence Rule 56 Motion for Summary Judgment is DENIED with respect to Plaintiff's First Amendment retaliation claim against Salame and GRANTED with respect to Plaintiff's First Amendment retaliation claim against the City.   Plaintiff's claim against the City is dismissed with prejudice.   Plaintiff's Motion for Partial Summary Judgment is

GRANTED with respect to Defendants' "whistleblower defenses" and "unspecified damages caps" defense, as well as Salame's official, legislative, and derivative sovereign immunity defenses.  Such defenses are all dismissed.  Plaintiff's Motion for Partial Summary Judgment is DENIED as moot with regard to the City's immunity defenses.

       **SO ORDERED**.

      October 21, 2012.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**